[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This decides the pending Termination of Parental Rights Petition as to Mark.
Mark has been in the custody of DCF since August 23, 1990. This initial placement occurred when Mark's mother, Tammy B., was arrested for attempting to burn a neighbor's car. On August 31, 1991, the Order of Temporary Custody was continued by agreement. On May 3, 1991, by agreement Mark was adjudicated neglected and committed to DCF for 18 months. On September 9, 1992, effective November 3, 1992, by agreement, the commitment to DCF was extended. Since August of 1990, Mark has remained in foster care, moving to a home in Wallingford which was more convenient for his mother.
The father is unknown. CT Page 2688
A trial of the Termination of Parental Rights petition was ordered and was held on November 5, 1993. The Petitioner submitted a Brief on November 12, 1993.
The evidence included the following testimony: Dr. David Mantell, a clinical psychologist; Dr. Richard Sadler, an expert psychiatrist; Ms. Jean Gambos, DCF social worker; Tammy B., the child's mother.
The documentary evidence included Dr. Mantell's Psychological Report (Exhibit 1), Dr. Sadler's Psychiatric Evaluation (Exhibit 2), and a DFS Study (Exhibit 3).
The court pursuant to In re Mark C., 28 Conn. App. 247, cert. denied; 223 Conn. 922 (1992), took judicial notice of the court's record on Mark.
Tammy B. is a seriously disturbed person with erratic psychiatric function, episodes of violent outbursts which have led to her arrests, a history of alcohol addiction and drug use, an inability to adequately appreciate her impairments and their effects, and a limited ability to care for herself. Despite her impairments the court finds her to have been competent during the course of these proceedings. This assessment as to competency appears to have been shared by the evaluator, therapists, her attorney and her guardian ad litem.
Because of his mother's impairments and resulting transient and chaotic lifestyle, Mark has been in foster care since the age of 14 months. He is a child with special needs due to the presence of significant behavioral and emotional difficulties as evidenced by aggressive acting out and due to delays in his speech development. These needs require that Mark be placed in a stable family environment where attention can be given to his special needs.
Immediately following adjudication on May 3, 1991, DFS stated that its expectations of Tammy B. were that she would attend therapy on a regular weekly basis, stabilize her living situation in order to provide a safe and appropriate home for Mark, and visit Mark as often as DFS would permit. Initially, these expectations were generally met and the frequency of visitations was increased. However, in early 1992, this situation changed and on March 6, 1992, the court clarified CT Page 2689 the expectations to indicate a specific time frame for compliance: directing Tammy B. to secure safe and appropriate independent housing within three months and, within one month thereafter, to enter and complete a dual diagnosis treatment program. From March 6, 1991 to July 14, 1992, Tammy B. moved 11 times, residing at nine different locations, was arrested three times for aggressive acts, and hospitalized two additional times. On July 17, 1992, Tammy B.'s visitation rights were suspended following a series of daily long telephone calls to Mark which resulted in agitated and aggressive behavior from him, and due to increasingly hostile contacts with the foster family.
In her own testimony at trial, Tammy B. appeared competent but lacking in judgement and insight. She recognized that she and Mark have special needs and that she has mental disorders, but seemed unable to understand how her problems might affect her ability to meet Mark's special needs.
The Termination Petition
The statutory grounds of the Termination of Parental Rights Petition are failure to rehabilitate and acts of omission or commission. However, the Petitioner has stated in its Brief that "the essence of this case is the failure to rehabilitate ground" and has not addressed the other ground. Conn. Gen. Stat. 17a-112(b)(2) defines failure to rehabilitate as follows:
 ". . . , the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child."
In the absence of parental consent, the termination of parental rights involves two distinct phases; the adjudicatory and dispositional. Rules of Practice Subsections 1042, 1044 and 1049. Procedurally, as in this case, the evidence as to both issues may be heard at the same trial; with the court first determining if the state has proven a statutory ground CT Page 2690 for adjudication before considering the dispositional question. State v. Anonymous, 179 Conn. 155, 172-273 (19__); In re Juvenile Appeal (84-b), 192 Conn. 254, 262 (1989); In re Valerie D., 223 Conn. 492, 511 (1992).
The court may adjudicate if the petitioner sustains either of the alleged grounds. In re Nicolina T., 9 Conn. App. 598,602 (1987).
The state's burden of proof on the termination of parental rights petition is clear and convincing evidence that the termination is in the best interests of the child and that, regarding any nonconsenting parent, the statutory conditions alleged in the petition have existed for at least one year. In re Juvenile Appeal (84-AB), 192 Conn. 254 (1984); In re Joshua Z., 26 Conn., App. 58 (1991). Conn. Gen. Stat. 17a-112(b) and45a-717(f).
There is no dispute that Mark was adjudicated neglected and/or uncared for on May 3, 1991, with continued commitment to DFS.
Conn. Gen. Stat. 17a-112(b)(2) defines "personal rehabilitation" as "the restoration of a parent to his or her former constructive role as a parent."
The original commitment was brought about by the mother's chaotic lifestyle which resulted in her arrest and her inability to provide Mark with safe and appropriate housing.
In determining the rehabilitative success of an individual parent, the court should consider the factors which led to the initial commitment and the specific expectations. In re Michael M., 29 Conn. App. 112, 126 (1992).
After some initial compliance, the mother failed to obtain safe and appropriate independent housing and to enter and complete a dual diagnosis treatment program for dealing with her substance addiction and abuse. Moreover, the psychiatric and psychological evaluations revealed that she has serious mental disorders, a limited ability to understand and provide for her own needs, and an insufficient ability to care for the special needs of her son. Her recent history of repeated moves, arrests and incarcerations, and hospitalizations support these evaluations. Both the psychologist and psychiatrist who CT Page 2691 made these evaluations have concluded that these additional factors make it unlikely that the mother will be able to successfully rehabilitate herself in the foreseeable future.
The court must analyze the parents's rehabilitative status as it relates to the needs and age of the particular child, and determine that restoration must be foreseeable within a reasonable time. Conn. Gen. Stat. 17-112(b) (20. In re Luis C., 210 Conn. 157, 67 (1989); In re Joshua Z., 26 Conn. App. 58,64 (1991) cert. denied, 221 Conn. 901 (1992).
Doctors Mantell and Sadler both stated Mark's need for a stable and secure home. Both doctors find no reason to expect that Mark's mother will be able to rehabilitate herself sufficiently in the foreseeable future to provide such a home. Therefore they and Mark's social worker as well as his attorney recommend termination of parental rights in order for Mark to be placed in a permanent, caring, safe and stable environment which is necessary to deal with his special needs and to maximize his opportunities for successful development.
Mark's best interests require a stable, caring and safe environment. There is no expectation that his mother will at any foreseeable time be able to provide such an environment.
The state has proven the statutory ground of failure to rehabilitate and the existence of that condition for at least one year by clear and convincing evidence.
The court must now address the issue of whether the termination of parental rights is in the interest of the child. In re Valerie D., 223 Conn. 492, 511 (1992).
Mark has been in foster care since August 23, 1990. The evidence from trained observers was clear and convincing that the relationship between Mark and his mother does not reach the level of a relationship between parent and child but is much more casual and superficial. Some observations suggest that Mark has established a closer relationship with his foster mother. Unfortunately, the foster family is not likely to become an adoptive family. Therefore, Mark's best interests would be served by terminating the parental rights of Tammy B. in order to free him for adoption.
It is only in the instance of such overwhelming CT Page 2692 counterceding interests that the natural rights of parents to the custody of their children is overcome. In re Juvenile Appeal (84-AB), 194 Conn. 252 (1984). It is important to note that in deciding a termination of parental rights petition, the court is not engaged in imposing punitive sanctions or moral judgement. The court only determines whether a specific statutory ground exists and, if so, is termination warranted by consideration of the child's best interest.
In any nonconsensual termination of parental rights, the court, pursuant to Conn. Gen. Stat. 17a-112(d), must make findings as to seven factors.
"The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
Timely services were provided in the form of foster care, transportation, evaluations of mother and child, and referrals for Mrs. B. to receive treatment.
"Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
By providing services and referrals to Mrs. B., the Department of Children and Families made reasonable efforts to make it possible for Mark to return home.
"The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations under such order."
DFS substantially met it obligations under the Court Ordered Expectations. Mrs. B. failed to meet them with respect to safe and appropriate housing and completion of a dual diagnostic treatment plan. In addition, there is evidence of Mrs. B.'s failure to cooperate with the foster family.
"The feelings and emotional ties of the child with respect to his parent, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties." CT Page 2693
Both Doctors Sadler and Mantell, conclude that there does not appear to be a parent-child relationship between Mark and his mother. Dr. Mantell reports that there is evidence of some level of bonding between Mark and his foster mother.
The age of the child. Mark's date of birth is June 16, 1989.
"The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future including but not limit to: (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contribution and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child."
Mrs. B. maintained contact with Mark until her visitation rights were suspended due to her increasingly hostile communications with the foster family and the increased aggression which Mark showed toward his foster family after her telephone calls.
Mrs. B. has not in any appreciable degree improved her circumstances to facilitate Mark's return. She has neither dealt sufficiently with her own dependency and other problems nor obtained safe and appropriate housing. She evidences both a lack of an understanding of Mark's special needs and how her own special needs impact her ability to meet his.
"The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
The mother's visitation rights were suspended in July 1992, because of their negative impact on Mark and the foster family and pending psychological and psychiatric evaluations. The suspension was maintained based on the findings of both evaluations and their recommendations that the visits not be resumed. CT Page 2694
It is unquestionably in Mark's best interests to terminate his mother's parental rights to free him for a permanent home. Mark should be adoptable but even long term foster placement would be better than his current status. In re Theresa S., 196 Conn. 18, 30 (1985); In re Rebecca W., 8 Conn. App. 92,95 (1986).
The parental rights of Tammy B. to Mark B. are terminated.
ROBERT F. McWEENY JUDGE, SUPERIOR COURT